**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION AT AKRON**

**In the Matter of:**

ALEXIS BALDWIN, KIRSTEN DAVY,     Case No.
HOLLY POST, MARIAH HATTER, and
MARCUS ROPER,     Judge

       Plaintiffs

V.

WALMART INC., and     **PLAINTIFFS ALEXIS BALDWIN,**
WAL-MART STORES EAST, LP,     **KIRSTEN DAVY, HOLLY POST, MARIAH**
     **HATTER, and MARCUS ROPER'S**
     **COMPLAINT FOR DAMAGES AGAINST**
     **WALMART WITH JURY DEMAND**
     Defendant     **ENDORSED HEREON**

## INTRODUCTION

Defendant tolerated its supervisor's severe and pervasive sexual harassment for years, despite repeated complaints that he had sexually harassed, and was continuing to sexually harass the female employees whom he supervised. When Plaintiffs complained to upper management of the harassment, Defendant did nothing to correct the supervisor's behavior and instead either actually or constructively terminated Plaintiffs for making their complaints. Plaintiffs Alexis Baldwin, Kirsten Davy, Holly Post, Mariah Hatter and Marcus Roper ("Plaintiffs") through Counsel, and for their Complaint for Damages against Walmart Inc. and Wal-Mart Stores East, LP (collectively "Walmart" or "Defendant"), hereby state as follows:

1.    This is an action for actual damages, statutory damages, and legal fees and expenses filed by Plaintiffs against Defendant for Defendant's improper actions and conduct

which violate Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 2000 et seq., as amended by the Civil Rights Act of 1991 (Title VII).

## PARTIES

2.      Plaintiff Alexis Baldwin is a resident of Portage County, Ohio, where she resided during the period of time relevant to this lawsuit and is a former employee of the Defendant.

3.      Plaintiff Kirsten Davy is a resident of Portage County, Ohio, where she resided during the period of time relevant to this lawsuit and is a former employee of the Defendant.

4.      Plaintiff Holly Post is a resident of Summit County, Ohio, where she resided during the period of time relevant to this lawsuit and is a former employee of the Defendant.

5.      Plaintiff Mariah Hatter is a resident of Portage County, Ohio, where she resided during the period of time relevant to this lawsuit and is a former employee of the Defendant.

6.      Plaintiff Marcus Roper is a resident of Summit County, Ohio, where he resided during the period of time relevant to this lawsuit and a former employee of the Defendant.

7.      Defendant Walmart Inc. is a corporation organized under the laws of the state of Ohio and is registered to do business with the Ohio Secretary of State.

8.      Defendant Wal-Mart Stores East, LP is a corporation organized under the laws of the state of Ohio and is registered to do business with the Ohio Secretary of State.

9.      Defendant Walmart Inc. and Defendant Wal-Mart Stores East, LP are collectively referenced under the terms "Walmart" and "Defendant" for all purposes of liability in this lawsuit. All counts are against both Defendants.

10.     Defendant is an employer of Plaintiffs for all purposes of liability in this lawsuit.

## JURISDICTION AND VENUE

11.     Plaintiffs' claims arise under both federal and Ohio state law.

2

12.     This Court has federal subject matter jurisdiction over this matter pursuant to Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 2000 et seq., as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981 (Title VII) and 28 U.S.C. § 1331, as Plaintiffs' Title VII claim constitutes a federal question.

13.     This Court has supplemental jurisdiction over the state law claims for sexual harassment in violation of Ohio Revised Code § 411202(A) and 4112.02(I) asserted herein under 1367(a) as these claims arise out of the same facts as those that comprise the basis for federal subject matter jurisdiction.

14.     This Court location is the proper venue for this action under 28 U.S.C. § 1391(b).

15.     Venue is proper in this District, pursuant to 28 U.S.C. § 1391, because (a) Plaintiffs are residents in this District and (b) all or a substantial part of the events giving rise to the claims in this lawsuit occurred in Portage County, Ohio.

## **FACTUAL ALLEGATIONS**

### **Plaintiff Alexis Baldwin**

16.     Plaintiffs restate and incorporate the allegations contained in Paragraphs 1 through 14 as if fully rewritten herein.

17.     Plaintiff Alexis Baldwin was employed by Defendant during the incidents at issue in this lawsuit.

18.     Plaintiff Baldwin was employed at the Walmart Supercenter located at 250 Tallmadge Road in Kent, Ohio from approximately April 2020 to September 2022.

19.     While working there, Plaintiff Baldwin was subjected to sexual harassment by her direct supervisor, Michael Lute, who was the team lead over the Mod Team on the midnight

shift. The Mod Team was responsible for moving product around to create room for new inventory, straightening and organizing inventory, and adjusting pricing.

20.     Lute sexually harassed Plaintiff Baldwin in many different ways. Starting in 2020, Lute began constantly referring to Plaintiff Baldwin as "Sweetie," and then progressed to calling her "Beautiful" and "Princess."

21.     Lute talked about how beautiful Plaintiff Baldwin was, which made her uncomfortable.

22.     Lute told Plaintiff Baldwin several times that he liked watching her from behind so he could see her butt.

23.     Plaintiff Baldwin did not reciprocate Lute's  advances at any time.

24.     Once at work, when Plaintiff Baldwin was bent down to put a box on the ground, Lute told her to "bend down for him," which had a clear sexual connotation. This made Plaintiff Baldwin extremely uncomfortable.

25.     One day around April 2022 when Plaintiff Baldwin was standing on a ladder cart working on a mod in the dog treats section, Lute came up and brushed his hand against Plaintiff Baldwin's buttocks. He came back one or two more times and rubbed the back of Plaintiff Baldwin's leg with his hand. He stared at Plaintiff Baldwin in the aisle that night, so obviously that her coworkers, Megan Muster and Cameron (last name unknown), told Plaintiff Baldwin that they noticed it. Muster mentioned the incident to Plaintiff Baldwin's mother, who in turn mentioned it to Plaintiff Baldwin out of concern. Plaintiff Baldwin's mother was a fellow Walmart employee.

26.     Lute continued to sexually assault Plaintiff Baldwin about once every shift for the next two weeks after the incident on the ladder cart. For example, on one occasion, Plaintiff

4

Baldwin returned from break, and Lute touched her with his hand on her buttocks. Another time, he grabbed Plaintiff Baldwin's buttocks with his hand, and when she tried to swat his hand away, he grabbed her hand and tried to hold it. Lute constantly followed Plaintiff Baldwin around the store, even when he had no work-related reason to be close by.

27.     Starting around this time, many employees told Plaintiff Baldwin that they saw Lute staring at her and heard some of his sexually inappropriate comments. Plaintiff Roper and Plaintiff Post  told Plaintiff Davy, who in turn told Plaintiff Baldwin about the staring and sexually inappropriate comments that Lute had made about Plaintiff Baldwin.

28.     Plaintiffs Post, Davy and Roper told Plaintiff Baldwin that they were concerned about the effect that the ongoing sexual harassment was having on Plaintiff Baldwin, and repeatedly asked her if she was okay.

29.     One time Plaintiff Baldwin took her sweatshirt off and said it was because it was hot in the facility, and Lute said, "I think you're hot."

30.     Around late April 2022, after a couple of weeks of this particularly bad harassment, Plaintiff Baldwin confronted Lute, telling him to stop touching her and making sexually inappropriate comments. Plaintiff Baldwin told Lute that her coworkers were concerned about what he was doing. Lute responded that "people need to mind their own damn business."

31.     Lute continued to sexually harass Plaintiff Baldwin even after she complained. He repeatedly  told Plaintiff Baldwin how he wanted to "lick" her and "eat" her.

32.     Plaintiff Baldwin once made a comment about how she had never tasted tonic water before, and he said "I want to taste your lips. Both sets."

33.     On another occasion during this time period, Plaintiff Baldwin told Lute that someone placed Hershey kisses out in the break room and he said that he wanted to give her kisses all over and lick her all over.

34.     During this time period, Lute constantly made insinuations that he and Plaintiff Baldwin were going to meet up outside of work and he was going to make sexual advances towards her. He made comments frequently about how he wanted to know what Plaintiff Baldwin tasted like, and that he thought she would taste "delicious." He constantly made an "mmhmm" sound at Plaintiff Baldwin, and looked her up and down.

35.     On another occasion during this time period, Lute entered the personnel office while Plaintiff Baldwin was reviewing her computer training videos. He leaned over her while she was sitting in the chair, nuzzled his face in her neck and hair, and told her "You smell so fucking good."

36.     Plaintiff Baldwin found it extremely difficult that her Team Lead – who approves her days off and issues disciplinary points – was sexually harassing her, even after she told him to stop.

37.     Plaintiff Baldwin tried to ignore and avoid him, avoiding eye contact whenever possible, and keeping her interactions as brief as possible.

38.     In response, Lute asked Plaintiff Baldwin around late May 2022 why she was "being weird." Plaintiff Baldwin again told him that he needed to stop sexually harassing her.

39.     Additionally, Plaintiff Baldwin saw Lute follow other new female employees around the store. She saw him do this to Keri (last name unknown) around June 2022. Lute took Keri back to the computer room to go over training videos and followed her closely around the

store. He only did this with Keri, and not the other employees being trained at the same time, and it was obvious he was sexually interested in her.

40.     Around June 2022, Plaintiff Baldwin complained to one of the other third shift Team Leads, Corey Geiger, about Lute's sexual harassment, and told him to do something about it. Plaintiff Baldwin became upset and started to cry, telling Geiger that she no longer wanted to be on the Mod Team because Lute would be her manager.

41.     Geiger informed Plaintiff Baldwin that Lute "handpicked" her and two other female employees – Kirsten Davy and Mariah Hatter – for his Mod Team because of his interest in working with them.

42.     This particularly disgusted Plaintiff Baldwin, because she and Plaintiffs Davy and Hatter could have just as easily been assigned to one of the other two third shift Team Leads and would have had much less contact with Lute.

43.     Plaintiff Baldwin was aware that Davy and Hatter had similar problems with Lute being sexually inappropriate toward them.

44.     Rather than do anything about Plaintiff Baldwin's complaint himself, Geiger told Plaintiff Baldwin to bring her concern to Human Resources.

45.     Shortly after meeting with Geiger, Plaintiff Baldwin met with store Human Resources employee Tori (last name unknown) and described in great detail Lute's sexual harassment of her.

46.     Tori told Plaintiff Baldwin that other female employees had complained about Lute and told her to write down her complaint.

47.      Plaintiff Baldwin wrote down a statement at the meeting and gave it to Tori.

48. After meeting with Tori, Plaintiff Baldwin heard nothing from anyone in management or Human Resources about the status of her complaint or any investigation.

49. However, it became clear that Lute knew about the complaint because he became extremely angry, retaliatory, and standoffish toward Plaintiff Baldwin. He barely interacted with her and slammed items on the table around her.

50. On one occasion, Plaintiff Baldwin asked for assistance with a mod that she was working on. Geiger was about to send an employee to help, but Lute intervened and told him that Plaintiff Baldwin could do the mod by herself.

51. Plaintiff Baldwin's coworker, Jeremy (last name unknown), and Plaintiff Baldwin's mother noticed Lute's changed behavior toward her, and asked what was going on between them.

52. After hearing nothing about the status of her sexual harassment complaint, Plaintiff Baldwin met with the store manager, Amy Carlin, around July to ask about the status of the complaint.

53. As she had with Tori, Plaintiff Baldwin told Carlin about Lute's sexual harassment and retaliation.

54. Carlin told Plaintiff Baldwin the matter was under investigation, without any further elaboration.

55. Shortly after her escalated complaints about Lute's sexual harassment, Walmart retaliated against Plaintiff Baldwin.

56. Around July 2022, Walmart pulled Plaintiff Baldwin aside and admonished her for coming into work when she was not officially on the schedule. It was a common and accepted practice for part-time employees like Plaintiff Baldwin to come to work even if they

8

were not on the schedule, because there was still work for them to do. Plaintiff Baldwin had done this many times in the past with management's knowledge and acceptance.

57. During the same shift for which she was disciplined, Plaintiff Baldwin's coworkers, Desiree (last name unknown) and Vaughn (last name unknown), also came in despite not officially being on the schedule. Plaintiff Baldwin is not aware of any discipline or admonishment that these coworkers received. Plaintiff Baldwin was singled out by Lute, who told her that she was not supposed to be there. It was clear he was angry at Plaintiff Baldwin and retaliating because of her sexual harassment complaint.

58. In August 2022, Plaintiff Baldwin informed Tori that she needed to switch availability to have Tuesdays off for her school schedule. Tori told Plaintiff Baldwin that this would not be an issue.

59. When Plaintiff Baldwin noticed her schedule still listed her as working Tuesday for the week of August 28, she contacted Team Lead Geiger via social media messaging the prior week to let him know in advance that she would not be coming in the following Tuesday.

60. Geiger responded, "Ok cool, thanks for reaching out. I'll make sure to take off [attendance] points that you may accumulate until the availability kicks in."

61. The following Tuesday, Plaintiff Baldwin sent Geiger another message reiterating, "Just reaching out to let you know I won't be there tonight because of my availability change. I was still scheduled."

62. This time, Gieger responded that she would accumulate attendance points – the opposite of what he previously told her. He further clarified regarding the points, "This message is from Amy [Carlin], she had been wanting to talk about the Mike thing so she[']s concerned. Team leads can't take points away or anything anymore[.]"

9

63.     On or about August 31, 2022, the day after her communication with Geiger, Plaintiff Baldwin was terminated. When she came into work, her managers Billy and Ashley called her into their office and terminated her, claiming she had too many attendance points.

64.     On September 2, 2022, Plaintiff Baldwin met again with Carlin at the store. In the meeting, which Plaintiff Baldwin recorded, she asked Carlin about her complaint against Lute. Carlin told Plaintiff Baldwin that the case was closed, and threatened Plaintiff Baldwin that she knows her coworkers and Plaintiff Baldwin were talking about it and "you all could have been fired for [it] so you guys have to stop talking about it."

65.     Plaintiff Baldwin responded that Lute openly discusses the investigation but had not been fired.

66.     Carlin told Plaintiff Baldwin that she conducted interviews, took statements, and submitted to her higher-ups.

67.     She warned Plaintiff Baldwin that, if she were to return back to work, she needed to be respectful to Lute.

68.     When Plaintiff Baldwin told Carlin that Lute had been treating everyone on her shift "like garbage" after they made sexual harassment complaints about him, Carlin dismissed Plaintiff Baldwin's concerns and Carlin claimed that she was unaware of this.

69.     Carlin then asked Plaintiff Baldwin to sympathize with how "awkward" and "uncomfortable" it must be for Lute to manage employees who complained about him.

70.     Carlin appeared less concerned about how awkward and uncomfortable it was for Plaintiff Baldwin and everyone else who was sexually harassed by Lute than she was for Lute's discomfort concerning their complaints about the sexual harassment.

**Plaintiff Holly Post**

10

71.     Plaintiff Holly Post was employed at the Walmart Supercenter located at 250 Tallmadge Road in Kent, Ohio from May of 2020 to September of 2022.

72.     While working there, Plaintiff Post was subjected to sexual harassment by her direct supervisor, Michael Lute, who was the Team Lead over the grocery section on the midnight shift.

73.     Lute sexually harassed Plaintiff Post in the following ways:

A. Several times per week, when Plaintiff Post and Lute walked together, he would walk behind Plaintiff Post and watch her walk from behind.

B. Lute called Plaintiff Post "Beautiful" approximately once per week during the period of time that she worked with him.

C. Lute called Plaintiff Post "Sweetie" virtually every day that she worked with him.

D. On one occasion during the summer of 2020, he called Plaintiff Post "Princess."

E. Virtually every day that she worked with him, Lute would stare at female customers and employees in a sexual manner that made Plaintiff Post uncomfortable.

F. Virtually every day that she worked with him, Lute would disparage the appearance of women he found unattractive. He routinely referred to one co-worker named Desiree (last name unknown) as "fat bitch" and "worthless" in Plaintiff Post's presence.

G. Several co-workers told Plaintiff Post that Mr. Lute said he would "like to climb [Post] like a tree."

H.  Two co-workers, Jason Leyland and another co-worker named Manny (last name unknown), told Plaintiff Post that Mr. Lute said he would "like to fuck the shit" out of' Plaintiff Post.

74.  Plaintiff Post also heard and observed Lute making the following statements that disparaged or demeaned the LGBTQ identity of others:

A.  On multiple occasions, Plaintiff Post witnessed him imitating the walk and speech of an openly gay employee, Lawrence Charlton.

B.  One former co-manager, Don (last name unknown), was fired for engaging in sexual encounters with other men during his work hours. Lute repeatedly told Plaintiff Post that he was disgusted with this. Lute also frequently tried to catch Don in the act of engaging in these sexual encounters in order to get him fired from his position.

75.  Plaintiff Post also heard and observed Lute making the following statements that disparaged or demeaned individuals who were disabled:

A.  A co-worker named Ron (last name unknown) is hard of hearing and walks with a limp. His hearing loss appears to cause him to shout, rather than speak, at times. On multiple occasions, Plaintiff Post witnessed Lute imitating Ron's speech and walk in a disparaging manner.

B.  A co-worker named Joe (last name unknown) appears to have cognitive impairment and a speech impediment. He frequently drools. On multiple occasions, Lute referred to Joe as "stupid" and was openly hostile toward him.

C.  A co-worker named Brandon (last name unknown) also appears to have a cognitive impairment and speech impediment. Brandon appears to have

12

difficulty in pronouncing the "r" sound. Lute frequently referred to him as "Bwandon" to mock his speech impediment.

76.     In or around July 2022, the Human Resources employee named Tori said that another employee had complained about Lute's sexual harassment and she asked Plaintiff Post to prepare a statement documenting her experiences with Mr. Lute.

77.     Plaintiff Post prepared two statements. Plaintiff Post prepared her first statement in July and gave it to Tori. Plaintiff Post prepared the second statement approximately two weeks after the first and gave both statements to Second Shift Coach Raquel (last name unknown) and Assistant Store Manager Charles (last name unknown). Plaintiff Post does not have a copy of these statements, but she wrote about Lute's harassment of her.

78.     Following her submission of these statements, Lute separated the employees who had complained about him from working together.

79.     In September of 2022, Lute counseled Plaintiff Post for alleged "time theft" which Walmart said had occurred six months earlier. Plaintiff Post did not engage in time theft.

80.     Walmart maintains an application or "app" that employees are required to keep on their cellular phones. That is how employees are instructed to clock in and out of work. The app was frequently either not working at all or working slowly. On a few occasions, Plaintiff Post overrode the login time on the app to reflect the time that she actually arrived at work, instead of the time that the app finally allowed Plaintiff Post to log in. This was not time theft because Plaintiff Post did not seek payment for time that she was not actually working.

81.     Plaintiff Post believes that her counseling for time theft was in retaliation for her complaints about Lute to the Employer.

13

82.     Shortly after Plaintiff Post was counseled, she resigned her employment with Walmart due to their unfair and retaliatory treatment.

**<u>Plaintiff Kirsten Davy</u>**

83.     Plaintiff Davy was employed at the Walmart Supercenter located at 250 Tallmadge Road in Kent, Ohio and has worked there since January of 2020.

84.     While working there, Plaintiff Davy was subjected to sexual harassment by her direct supervisor Michael Lute, who was the Team Lead over the grocery section on the midnight shift. Lute sexually harassed Plaintiff Davy in the following ways:

> A. Once during the spring of 2022 when Plaintiff Davy was stocking milk, Lute was about fifteen feet away from her and called out to her: "Damn, I could see that ass from a mile away." He said this first to Plaintiff Davy, but later repeated it to two other night stockers, Jason Leyland and David Johnson.

> B. In September of 2022, while Plaintiff Davy and Lute were unpacking Christmas inventory, Lute said:: "Being transgendered has become so popular that soon Mrs. Claus will have a penis and Mr. Claus will have breasts and a vagina. Kids will have to worry about sitting on either one's laps." Lute's supervisor, Ashley (last name unknown), was present when he said this. She just laughed and walked away. Plaintiff Davy is a member of the LGBTQ community.

85.     Plaintiff Davy also heard and observed Lute sexually harassing others in the following ways:

> A. During the spring of 2022, Plaintiff Davy heard Lute say:, "I want to climb her like a tree" in reference to co-worker Plaintiff Holly Post.

14

B.  During the week of April 26, 2022, Plaintiff Davy saw Lute put his hands on his genitals and use the other side of his hand to graze up against her co-worker Plaintiff Alexis Baldwin's buttocks. His hand was the only thing separating his genitals from her buttocks. When Plaintiff Baldwin told him to stop, he laughed.

86.     Plaintiff Davy complained about Lute's behavior to Store Manager Amy Carlin, during the spring of 2022. Plaintiff Davy told Amy that she did not feel comfortable working with Lute.

87.     During that conversation, Carlin appeared to be sympathetic to Plaintiff Davy and said that this kind of sexual harassment should not be going on.

88.     Carlin promised Davy she would "look into it." However, during the same conversation, which occurred in Carlin's office, Carlin pointed to a photo of her daughter on her desk and said, "I need to be looking out for number one."

89.     Plaintiff Davy is not aware whether Carlin ever spoke to Lute or whether he suffered any consequences as a result of Plaintiff Davy's complaint.

90.     Around May 2023, Plaintiff Davy resigned from Walmart, in large part due to Lute's sexual harassment and the company's failure to address it.

**Plaintiff Marcus Roper**

91.     Plaintiff Marcus Roper was employed at the Walmart Supercenter located at 250 Tallmadge Road in Kent, Ohio from May of 2020 to October 12, 2022.

92.     While working there, Plaintiff Roper was subjected to retaliation that occurred as a result of him reporting the sexual harassment that he observed by his direct supervisor Michael Lute, who was the Team Lead over the grocery section on the midnight shift.

93.     Plaintiff Roper observed Lute sexually harass his co-workers in the following ways:

A.  On a nearly daily basis, he would refer to women as "bitches." He called the following women "bitches": Jill Thornhill, who was a coach over him; Amy Carlin, the store manager; Desiree (last name unknown), a co-worker; Stephanie (last name unknown), a former co-worker on the second shift; and store customers. He sometimes called these women "bitches" to their faces and other times said it behind their backs.

B.  On one occasion, Lute told Plaintiff Roper and a co-worker Jason Leyland: "Women belong in the kitchen."

C.  On one occasion, maintenance workers had to clean up spilled laundry detergent. Lute said loudly that they "had to clean up jizz."

D.  On several occasions, Lute walked behind Thornhill and made masturbation gestures as she walked.

E.  On multiple occasions, Lute would speculate about how often females at the worksite had sex.

F.  On multiple occasions, if Lute found women old or unattractive, he would call them "ugly" and state that he bets "they never get any."

G.  On one occasion, the store manager, Amy Carlin, was in a bad mood and Lute said to his coworkers: "She must not have gotten dick lately."

H.  On another occasion, Thornhill was arguing with her boyfriend, and Lute told others about it, stating: "Her boyfriend must not be giving it to her."

16

I. Virtually every day that Plaintiff Roper worked with him, Lute would call women "sweetie." Plaintiff Roper heard him call Plaintiff Mariah Hatter, a co-worker, "princess." Plaintiff Roper heard him call Plaintiff Kirsten Davy, a co-worker, "sweet ass."

J. Plaintiff Roper repeatedly observed Lute situating himself so that he could work with Plaintiff Hatter, one of the women he sexually harassed. One time a Team Lead, Destiny (last name unknown), observed Lute working with Plaintiff Hatter and said to Plaintiff Roper, "I don't feel comfortable with them working together."

K. Plaintiff Roper repeatedly observed Lute situating himself so that he could work alone with another female associate named Keri (last name unknown).

L. Lute was a supervisor over an associate named Doreen (last name unknown), and they began dating while he was her supervisor. On at least three occasions during the fall of 2021, Plaintiff Roper observed them kissing in the store during their fifteen-minute break.

M. Lute referred to the store manager, Amy Carlin, as "fat bitch" on multiple occasions. Once he said to Plaintiff Roper: "She must have had triplets but only one came out."

94. Plaintiff Roper also heard and observed Lute making the following statements that disparaged or demeaned the LGBTQ identity of others:

A. On multiple occasions, Plaintiff Roper witnessed Lute imitating the walk and speech of an openly gay employee, Lawrence Charlton.

17

B.  One former co-manager, Don (last name unknown), was fired for engaging in sexual encounters with other men during his work hours. Lute repeatedly told Plaintiff Roper that he was disgusted with this. He also frequently tried to catch Don in the act of engaging in these sexual encounters in order to get him fired from his position. Prior to Don's termination, Don was under investigation because Walmart suspected him of this misconduct. Even though the investigation was supposed to be confidential, Lute told many associates about it, expressed his disgust, and repeatedly referred to Don as a "fag."

C.  On multiple occasions, Lute referred to the wife or girlfriend of an employee named David (last name unknown) as a "tranny." In Plaintiff Roper's presence, Lute showed another employee David's (last name unknown) Facebook profile and said that David's wife or girlfriend, Julie, is a "tranny."

D.  On one occasion, Lute referred to a customer who appeared to be transgender as a "she-he" to other employees.

95.  Plaintiff Roper also heard and observed Lute making the following statements that disparaged or demeaned individuals who were disabled:

A.  A co-worker named Ron (last name unknown) is hard of hearing and walks with a limp. His hearing loss appears to cause him to shout, rather than speak, at times. On multiple occasions, Plaintiff Roper witnessed Lute imitating Ron's speech and walk in a disparaging manner. Ron was in the vicinity when Lute mocked him but Plaintiff Roper does not know whether Ron actually saw it.

B.  A co-worker named Joe (last name unknown) appears to have a cognitive impairment and a speech impediment. He frequently drools. On multiple

18

occasions, Lute referred to Joe as "stupid" and was openly hostile toward him. Plaintiff Roper does not believe that Lute called him "stupid" to his face.

C. A co-worker, also named Mike (last name unknown), who works in the Fresh Department has a limp, walks slowly, and appears to have a disability that affects his arm movements. Lute repeatedly imitated the way that Mike walked, although Plaintiff Roper does not know whether Mike saw him do so. On one occasion, Plaintiff Roper heard Lute say to Mike: "You're really working at a hard clip," in a sarcastic tone.

D. A co-worker named Brandon (last name unknown) also appears to have a cognitive impairment and speech impediment. He appears to have difficulty in pronouncing the "r" sound. Lute frequently referred to him as "Bwandon" to mock his speech impediment. This was done in Brandon's presence.

96. Plaintiff Roper also heard and observed Lute making the following statements that disparaged or demeaned individuals on the basis of their age:

A. One associate named Dean (last name unknown) is elderly. Lute repeatedly called him "worthless," "old bastard," and said that he is "not doing shit." Plaintiff Roper does not know if Dean heard Lute say these things. On one occasion, Lute was apparently displeased at Dean's pace in unloading cardboard, so Lute said to Dean, sarcastically: "Boy, you're really busting your ass tonight." Dean sighed and walked away.

B. There is an older associate named Mike (last name unknown) who is heavyset and frequently rides the scrubber while he is working. Lute repeatedly laughed at him and said, sarcastically to him: "I can see you're really working hard." Lute

19

also repeatedly shouted to others about Mike, in Mike's presence: "He's got the easiest job in the store."

   C.  There is an older associate named Jeff (last name unknown), who used a cane but frequently stored it on his back if he was performing a stationary task. Lute mocked him by saying: "He's a martial arts master." On one occasion, Jeff was eating a slice of Swiss cheese and Lute called him a "rat" and then called him "Master Splinter" in reference to a character from the Teenage Mutant Ninja Turtles cartoon who is a rat who can perform martial arts. Jeff was also balding, and Lute said to him on more than one occasion: "You just need to let it go," referring to Jeff's hair.

   D.  There is an older associate named Laura (last name unknown). Despite her age, Lute frequently placed Laura on a more physically demanding job assignment and would yell at her for not performing it quickly enough, saying: "If you keep working at this pace, you're not going to have a job anymore."

97.    Plaintiff Roper also heard and observed Lute making the following statements that disparaged or demeaned individuals on the basis of their race or ethnicity:

   A.  Lute repeatedly referred to a middle-eastern associate named Hashim (last name unknown) as a "terrorist."

   B.  There is a female associate named Desiree (last name unknown) who is African American and heavy set. Lute repeatedly called her "worthless" and "fat bitch." Once Lute and Desiree got into an argument about the schedule. As Desiree walked away, Lute said over the walkie-talkie for other associates to hear: "Fat black bitch."

20

98.     In addition to all of these discriminatory behaviors, Lute encourages associates to commit acts that are unsafe and hazardous, such as stepping on pallets and bins and foregoing the use of safety equipment.

99.     Plaintiff Roper complained about Lute's harassing behaviors in early summer of 2022, along with Plaintiffs Baldwin, Post and Davy, , and another co-worker, Juan Carlos (last name unknown). Plaintiff Roper believes that Amy Carlin, the store manager, did not keep these confidential because Lute found out about them.

100.    Following the complaints against him, Lute retaliated against employees who he believed had made the complaints. On one occasion, Plaintiff Hatter returned less than a minute late from one of her breaks and Lute yelled at her: "What the fuck, Mariah? I thought we were friends!"

101.    In or around early October 2022, Plaintiff Roper received an adverse employment action known as "coaching" for allegedly stealing time from the Company six months earlier. Plaintiff Roper did not steal time. Walmart requires employees to download an app onto their phone and use it to log in and out of work, punching an electronic time clock. Frequently the app is not working, requiring Plaintiff Roper and other associates to manually log in to the system.

102.    Plaintiff Post, who also complained about Lute, was also written up for alleged time theft, occurring six months earlier. She also did not steal time. Like Plaintiff Roper, she was forced to manually enter her time because the app was down.

103.    Lute would frequently take thirty or forty-five-minute breaks, when the scheduled break time was only for fifteen minutes. Lute's friends, Zack and David (last names unknown), would also take thirty-minute breaks. Lute never wrote them up for time theft or complained about them improperly extending the length of their breaks.

104.   After Plaintiffs Roper and Post complained about Lute, Lute reassigned Plaintiffs Roper and Post so that they no longer worked on the same team.

105.   Shortly after the counseling for alleged time theft, Plaintiff Roper told Amy Carlin that he believed that Lute was retaliating against those who complained about him. When Carlin asked Plaintiff Roper for examples, Plaintiff Roper told her about Plaintiff Roper and Plaintiff Post being assigned to different teams. Carlin replied sarcastically: "So you are claiming retaliation because you don't get to work with your girlfriend anymore?" Carlin also said: "You should be complaining about this to your coaches, not me."

106.   On or about October 12, 2022, Plaintiff Roper was terminated for an alleged safety violation. As Plaintiff Roper pushed a shopping cart to an area where he needed to use it, he stood on it and rode it. Plaintiff Roper had been doing this for years, and in front of supervisors, including Lute. No one had ever told Plaintiff Roper that he should not do so. Lute also stands on shopping carts and rides them as he pushes them forward, and in front of other associates and supervisors—the same thing that Roper was fired for doing.

107.   Plaintiff Roper was the boyfriend of Plaintiff Post, who also complained about Lute's sexual harassment.

108.   His relationship to Plaintiff Post was also why Defendant fired him, out of retaliation against him and Plaintiff Post.

**Plaintiff Mariah Hatter**

109.   Plaintiff Mariah Hatter was employed at the Walmart Supercenter located at 250 Tallmadge Road in Kent, Ohio from May 19, 2020 to May 19, 2022.

110.    While working there, Plaintiff Hatter was subjected to sexual harassment by her direct supervisor, Michael Lute, who was the Team Lead over the grocery section on the midnight shift.

111.    Lute sexually harassed Plaintiff Hatter in the following ways:

A. He made sexually inappropriate comments to her virtually every day that she worked with him, including calling her "Princess," "hot," "beautiful," and proclaiming that "I love you."

B. On one occasion he ran his hand along Plaintiff Hatter's lower back.

C. Plaintiff Hatter conveyed her discomfort with his sexual harassment by continually walking away from him and giving him disapproving facial expressions. However, Lute continued sexually harassing her.

D. On one occasion, when Plaintiff Hatter was walking in front of Lute and another male employee, Lute and the other employee were speaking about oral sex. Plaintiff Hatter heard them use the phrase "blow job" and Lute and the other employee appeared to be discussing which employees they wanted to receive oral sex from. Plaintiff Hatter turned around and said, "I cannot believe you guys are talking about this." The other employee replied: "You are like one of the guys so it is okay." Lute did not take any action to correct the other employee's statement.

112.    Plaintiff Hatter also heard and observed Lute making the following statements that disparaged or demeaned the race or national origin of others:

A. On multiple occasions, he called Ahmad (last name unknown), one of the Walmart coaches who is Black, a "porch monkey."

23

B. On multiple occasions, he called a co-worker, Fatuma, who is non-white and speaks with a non-Ohio accent "flamunga cheese" – a slang ("from under cheese") referencing the buildup of dirt and body fluids from unwashed genitals. He has also imitated her accent in a mocking and insulting manner.

113. Plaintiff Hatter also heard and observed Lute making the following anti-LGBTQ statements:

A. On multiple occasions, Plaintiff Hatter witnessed Lute imitating the walk and speech or an openly gay employee, Lawrence Charlton.

B. On multiple occasions, Plaintiff Hatter witnessed Lute imitate effeminate speech patterns in a way that was insulting to LGBTQ individuals.

114. Plaintiff Hatter also heard and observed Lute making the following statements that disparaged or demeaned individuals who were disabled:

A. A co-worker named Ron (last name unknown) is hard of hearing and walks with a limp. His hearing loss appears to cause him to shout, rather than speak, at times. On multiple occasions, Plaintiff Hatter witnessed Lute imitating Ron's speech and walk in a disparaging manner.

115. On multiple occasions, Plaintiff Hatter complained to co-workers Plaintiffs Post and Davy, Lawrence Charlton, and Jason Leyland about Lute's behavior. Plaintiff Hatter also warned female co-workers who were new to the shift to avoid Lute because of his sexual harassment, although she does not recall the names and dates of these warnings.

116. In late 2020, co-workers told Plaintiff Hatter that they believed that a female employee named Mandy (last name unknown) who worked in the online grocery department,

had filed a written complaint against Lute for sexual harassment with the Walmart Human Resources Department.

117.    Plaintiff Hatter suffers from generalized anxiety disorder and takes anti-anxiety medication. Sometimes her condition results in her experiencing panic attacks. Working with Lute aggravated this condition.

118.    The final incident that caused Plaintiff Hatter to resign her employment occurred as follows:

A.    In May of 2022, Plaintiff Hatter had surgery on her wrist and had to be taken off her anxiety medication due to the surgery, which was causing to her experience more anxiety than usual on her first day back to work.

B.    Plaintiff Hatter was leaving to go to the bathroom to cry intermittently that night, in an effort to help control her anxiety and stave off a panic attack.

C.    Plaintiff Hatter's Team Lead Corey Geiger yelled at her that she could not just keep leaving to go to the bathroom.

D.    Plaintiff Hatter explained to him that she suffered from anxiety, experienced panic attacks and was unable to take her medication at that time, and that she was attempting to control her anxiety. Geiger replied, "Well, maybe you should just go home."

E.    Plaintiff Hatter agreed and prepared to leave for home, but Geiger then yelled at her again, saying: "You cannot just leave." The next day, she prepared a written statement detailing her problems at the workplace, including the ongoing sexual harassment by Lute, and turned it in to the personnel department. Plaintiff Hatter resigned that day, in large part due to Lute's sexual harassment.

25

### COUNT I: SEXUALLY HOSTILE WORK ENVIRONMENT
### AND GENDER-BASED DISCRIMINATION
**(Title VII of The Civil Rights Act of 1964, 42 U.S.C. 2000e, *et seq.*)**
**All Plaintiffs**

119.    The Plaintiffs restate the allegations contained in the preceding paragraphs as if fully restated herein.

120.    Plaintiffs timely filed charges for this count with the Equal Employment Opportunity Commission ("EEOC").

121.    After the EEOC issued Plaintiffs' right to sue letters for this count, Plaintiffs timely filed this lawsuit within 90 days after their issuance.

122.    All administrative prerequisites to the filing of this lawsuit are satisfied.

123.    As set forth in the preceding paragraphs, Defendant subjected Plaintiffs to a sexually hostile work environment in violation of Title VII.

124.    Defendant created and fostered a severe and pervasive sexually hostile work environment that consisted of, among other things: (a) Employing and retaining a supervisor who made numerous unwanted sexual comments to and about Plaintiffs; (b) Employing and retaining a supervisor who made numerous unwanted sexual advances made toward Plaintiffs; and (c) Failing to adequately prevent and correct the sexually harassing behavior, even after it was repeatedly and explicitly brought to the attention of its management.

125.    This sexually hostile work environment included anti-LGBTQ discrimination against Plaintiff Davy based on her gender and sexual orientation.

126.    Because the sexual harassment at issue was open and notorious and because Plaintiffs complained, Defendant's management either knew or should have known about the

sexual harassment, yet it failed to take appropriate remedial action. Defendant did not take reasonable steps to prevent and correct the harassment even after Plaintiffs complained.

127.    Defendant is also strictly, automatically and directly liable for the sexual harassment committed by Michael Lute as a supervisor and manager.

128.    Defendant constructively discharged Plaintiffs Davy, Hatter, and Post, and actually discharged Plaintiffs Baldwin and Roper due to the intolerable sexually hostile work environment, gender-based discrimination, and Plaintiffs' opposition to this discrimination.

129.    As a direct and proximate result of Defendant's violations, Plaintiffs suffered lost wages, emotional distress, anguish, and mental and physical pain and suffering.

130.    Plaintiffs are entitled to recover compensatory damages for past, present, and future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment to life to the maximum extent and amount by law.

131.    Defendant intentionally engaged in the above-described discriminatory practices with malice and/or reckless indifference to the legally protected rights of Plaintiffs.

132.    Accordingly, Plaintiffs are entitled to an award of punitive and exemplary damages against Defendant.

133.    Plaintiffs seek relief as set forth below.

### COUNT II: RETALIATION
**(Title VII of The Civil Rights Act of 1964, 42 U.S.C. 2000e, *et seq.*)**
**Plaintiffs Baldwin, Post, and Roper**

134.    Plaintiffs Baldwin, Post, and Roper restate the allegations contained in the preceding paragraphs as if fully restated herein.

135.    Plaintiffs timely filed charges for this count with the EEOC.

136.    After the EEOC issued Plaintiffs' right to sue letters for this count, Plaintiffs timely filed this lawsuit within 90 days after their issuance.

137.    All administrative prerequisites to the filing of this lawsuit are satisfied.

138.    As set forth in the preceding paragraphs, Defendant subjected Plaintiffs to retaliatory adverse employment actions, including mistreatment, reassignment, discipline, and termination, in violation of Title VII after and because Plaintiffs complained about and opposed a sexually hostile work environment and otherwise asserted their rights to be free from a sexually hostile work environment.

139.    Defendant also terminated Plaintiff Roper out of retaliation against him and Plaintiff Post, because Plaintiff Roper was Plaintiff Post's boyfriend.

140.    Defendant is also strictly, automatically, and directly liable for the retaliation committed by Michael Lute as a supervisor and managers.

141.    As a direct and proximate result of Defendant's violations, Plaintiffs suffered lost wages emotional distress, anguish, and mental and physical pain and suffering. Therefore, Plaintiffs are entitled to recover compensatory damages for past, present, and future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment to life to the maximum extent and amount by law.

142.    Defendant intentionally engaged in the above-described discriminatory practices with malice and/or reckless indifference to the legally protected rights of Plaintiffs.

143.    Accordingly, Plaintiffs are entitled to an award of punitive and exemplary damages against Defendant.

144.    Plaintiffs seek relief as set forth below.

**COUNT III: SEXUALLY HOSTILE WORK ENVIRONMENT**

**AND GENDER-BASED DISCRIMINATION**
**(Ohio Civil Rights Act – Ohio Revised Code § 4112.02(A))**
**All Plaintiffs**

145.     Plaintiffs restate the allegations contained in the preceding paragraphs as if fully restated herein.

146.     Plaintiffs dual-filed their EEOC charges with the Ohio Civil Rights Commission ("OCRC") to include OCRA claims.

147.     All administrative prerequisites to the filing of this lawsuit are satisfied.

148.     Defendant created and fostered a severe and pervasive sexually hostile work environment based on sex that was sufficiently severe and pervasive enough to affect the terms and conditions or privileges of employment (or any matter directly related to employment) that consisted of, among other things (a) Employing and retaining a supervisor who made numerous unwelcome sexual comments to and about Plaintiffs; (b) Employing and retaining a supervisor who made numerous unwelcome sexual advances to Plaintiffs; and (c) Failing to adequately prevent and correct sexually harassing behavior.

149.     This sexually hostile work environment included anti-LGBTQ discrimination against Plaintiff Davy based on her gender and sexual orientation.

150.     Because the sexual harassment at issue was both committed by a supervisor and open and notorious, and because Plaintiffs complained, Defendant's management either knew or should have known about the sexual harassment, yet it failed to take appropriate remedial action.

151.     Defendant did not take reasonable steps to prevent and correct the harassment even after Plaintiffs complained.

152.    Defendant is also strictly, automatically, and directly liable for the sexual harassment committed by Michael Lute and Amy Carlin as high-level supervisors and managers,.

153.    Defendant constructively discharged Plaintiffs Davy, Hatter, and Post, and actually discharged Plaintiffs Baldwin and Roper due to the intolerable sexually hostile work environment, gender-based discrimination, and Plaintiffs' opposition to this discrimination.

154.    As a direct and proximate result of Defendant's violations, Plaintiffs suffered lost wages emotional distress, anguish, and mental and physical pain and suffering.

155.    Plaintiffs are entitled to recover compensatory damages for past, present, and future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment to life to the maximum extent and amount by law.

156.    Plaintiffs are entitled to an award of punitive and exemplary damages against Defendant.

## COUNT IV: RETALIATION
### (Ohio Civil Rights Act – Ohio Revised Code § 4112.02(I))
### Plaintiffs Baldwin, Post, and Roper

157.    Plaintiffs restate the allegations contained in the preceding paragraphs as if fully restated herein.

158.    Plaintiffs dual-filed their EEOC charges with the OCRC to include OCRA claims.

159.    All administrative prerequisites to the filing of this lawsuit are satisfied.

160.    As set forth in the preceding paragraphs, Defendant subjected Plaintiffs to retaliatory mistreatment, reassignment, discipline, and termination in violation of the R.C. 4112.02(I) after and because they complained about and opposed a sexually hostile work

environment and otherwise asserted their rights to be free from a sexually hostile work environment.

161. Defendant also terminated Plaintiff Roper out of retaliation against him and Plaintiff Post, because Plaintiff Roper was Plaintiff Post's boyfriend.

162. Defendant is also strictly, automatically and directly liable for the retaliation committed by Michael Lute and Amy Carlin as high-level supervisor and managers.

163. As a direct and proximate result of Defendant's violations, Plaintiffs suffered lost wages emotional distress, anguish, and mental and physical pain and suffering.

164. Plaintiffs are entitled to recover compensatory damages for past, present, and future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment to life to the maximum extent and amount by law.

165. Plaintiffs are entitled to an award of punitive and exemplary damages against Defendant.

## JURY DEMAND

166. Plaintiff hereby demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Alexis Baldwin, Holly Post, Kirsten Davy Marcus Roper and Mariah Hatter respectfully request that this Court enter an Order granting judgment against Walmart:

A. For declaratory judgment that Defendant violated Plaintiffs' rights under Title VII and Ohio Revised Code §§ 4112.02(A) and 4112.02(I);

B. For an Order that Plaintiffs be reinstated to their employment;

31

C.      For an award of economic damages in the maximum amount for lost wages and benefits, monetary losses, back pay, front pay, liquidated damages, and all other damages allowed by law;

D.      For an award of non-economic damages including for emotional and physical pain, suffering, inconvenience, mental anguish, punitive damages, exemplary damages, and loss and enjoyment to life.

E.      For an award of Plaintiffs' reasonable attorneys' fees and costs;

F.      For an award of pre-judgment and post-judgement interest; and

G.      Granting all such further and other relief as this Court deems just and appropriate.


                        Respectfully Submitted,

                        /s/Alisa Adams, Esq.
                        Alisa R. Adams (98503)
                        Adams Law Practice, LLC
                        P.O. Box 1834
                        Cleveland, Ohio 44106
                        (216) 926-0065
                        Alisa.Adams@hotmail.com


                        /s/Matthew J. Clark, Esq.
                        Matthew J. Clark
                        (pro hac vice admission pending)
                        Gregory, Moore, Brooks & Clark, P.C.
                        28 West Adams Ave., Suite 300
                        Detroit, MI 48226
                        (313) 964-5600 (Telephone)
                        (313) 964-2125
                        Matt@unionlaw.net
                        *Attorneys for Plaintiffs*